**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

BETWEEN:-

**POSH SAUDI CO. LTD.**
of Dammam, Saudi Arabia

<u>Claimants</u>
(Owners)

and

**DYNAMIC INDUSTRIES SAUDI ARABIA LTD.**
of Al Khobar, Saudi Arabia

<u>Respondents</u>
(Charterers)

**"POSH ENDEAVOUR"**

<u>Charterparty dated 1st October 2018</u>

_____

**FINAL ARBITRATION AWARD**

_____

**WHEREAS:**

1.   By a timecharterparty on an amended SUPPLYTIME 2005 form dated Saudi
     Arabia, 1st October 2018 ("the charterparty"), the Claimants ("the Owners")
     chartered the Offshore Supply Vessel "Posh Endeavour" ("the vessel") to the
     Respondents ("the Charterers") for a period of "*200 DAYS FIRM*", with the

**EXHIBIT "B"**

Charterers having the option to extend the duration of the charterparty for *"2 x 7 DAYS, 14 x 1 DAY"* on terms and conditions more particularly set out in the charterparty.  Pursuant to four subsequent Addenda (numbered 1, 2, 3 and 4), the duration of the charterparty was extended to 18th January 2020.

2.  Clause 34 of the charterparty incorporated the BIMCO Dispute Resolution Clause and provided, where relevant, as follows:

> *"(a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provision of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.*
>
> *The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as the sole arbitrator and shall advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.*
>
> *Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of sole arbitrator.*
>
> *In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced …"*

3.  Disputes, hereinafter more particularly defined, arose between the parties for the determination of which the Owners appointed me, Edward Mocatta of Suite 6, 6th Floor, Central House, 1 Ballards Lane, London, N3 1LQ and the Charterers appointed me, Patrick O'Donovan of Basement Suite, 131 High Street, Teddington, Middlesex, TW11 8HH.  In due course, we the party-appointed arbitrators appointed the undersigned, Michael Baker-Harber of 87 High Street, Burnham-on-Crouch, Essex, CM0 8AH to be the Third Arbitrator.

We are all Members of the Baltic Exchange in the City of London and Full Members of the London Maritime Arbitrators Association ("the LMAA").

4.    The seat of the arbitration is London, England.

5.    The dispute referred to us was the Owners' claim for US$3,998,167.80 in respect of what they said was the total outstanding principal sum due under the charterparty.  They also claimed interest at the contractual rate of 2% per month after the due date of each of the outstanding principal invoices. Alternatively, the Owners said they were entitled to interest to be assessed pursuant to section 49 of the Arbitration Act 1996.  They also claimed their costs.

6.    The Charterers denied liability for the sum(s) claimed or any sum and asked us to make an Award in their favour:

(a)    declaring that the Charterers are entitled to rely on the *force majeure* provisions in Clause 32 of the charterparty as a defence to the Owners' claims; charterparty;

(b)    dismissing the Owners' claims in full; and

(c)    ordering the Owners to pay all of the Charterers' costs incurred in connection with this arbitration, including fees and expenses of the Tribunal, legal fees and expenses, witnesses' expenses, and interest on all costs awarded.

7.    The reference proceeded by the exchange of written submissions between Clyde & Co. Clasis Singapore Pte. Ltd. in Singapore ("Clyde & Co,") and Dentons UK and Middle East LLP in London ("Dentons").  Clyde & Co. served Claim

Submissions on 27th May 2020; Dentons served Defence Submissions on 3rd July 2020; and Clyde & Co. served Reply Submissions by email on 16th July 2020.  In that same email Clyde & Co. applied to us for the immediate determination of the Owners' claim on the basis of the submissions served to date and for (i) a Final Award in respect of the principal sum of US$3,998,167.80 and costs and (ii) a Final Award in respect of interest at the contractual rate of 2% per month.  By email on 6th August 2020, Dentons served the Charterers' response to the application.  By email on 11th August 2020, Clyde & Co. served the Owners' reply to the Charterers' response to the Owners' application.

8.  Our Reasons for this Award are annexed hereto and form part hereof.

**NOW WE** the said Arbitrators, Edward Mocatta, Patrick O'Donovan and Michael Baker-Harber having accepted the burden of this reference and having carefully and conscientiously considered the submissions and evidence (all documentary) placed before us and having given due weight thereto and finding ourselves in agreement, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL ARBITRATION AWARD** as follows:

(A)  **WE FIND AND HOLD** that the Owners' claim in the sum of US$3,998,167.80 succeeds in full.

(B)  **WE THEREFORE AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the said sum of US$3,998,167.80 (Three Million Nine Hundred and Ninety Eight Thousand, One Hundred and Sixty-Seven United States Dollars and eighty cents) **PLUS** interest at the contractual rate

of 2% per month from the due date of each of the invoices set out in paragraph 4 of our Reasons until the date of payment.

(C) **WE FURTHER AWARD AND ADJUDGE:**

(i)    that the Charterers shall bear their own costs and pay the Owners' costs of the reference (and the Owners' said costs may, if not agreed, be determined by us or in the High Court in London in the Owners' option on the basis set out in s.63(5) of the Arbitration Act), for which purpose **WE HEREBY RESERVE JURISDICTION** to make a subsequent Award of Costs;

(ii)    that the Charterers shall further bear and pay the costs of this our Final Arbitration Award (inclusive of our fees and interlocutory charges in relation hereto) in the sum of £16,800, **PROVIDED ALWAYS** that if, in the first instance, the Owners shall have paid any amount in respect of the costs of this our Award they shall be entitled to immediate reimbursement by the Charterers of any sum or sums so paid; **AND**

(iii)    that the Charterers shall pay interest on any sums payable to the Owners under sub-paragraphs C(i) and (ii) above at the rate of 4.5% (four and one-half per cent) per annum or pro rata compounded at three-monthly rests from the date of this our Final Arbitration Award until the date of payment or reimbursement as appropriate.

(D) **WE DECLARE** that this Award is **FINAL** as to the matters hereby determined.

**GIVEN** under our hands at the seat of the arbitration in London, England this *2nd* day of *September* 2020

Edward Mocatta

Patrick O'Donovan

Michael Baker-Harber

**"POSH ENDEAVOUR"**

Charterparty dated 1st October 2018

**REASONS FOR AND FORMING PART OF**
**FINAL ARBITRATION AWARD**

**The dispute before us**

1.   The "Posh Endeavour" is an Offshore Service Vessel.  In this arbitration, the Owners claimed US$3,998,167.80, being what they said was the total outstanding principal sum due under the charterparty.  They also claimed interest at the contractual rate of 2% per month after the due date of each of the outstanding principal invoices.  Alternatively, the Owners said that they are entitled to interest to be assessed pursuant to s.49 of the Arbitration Act 1996 on all sums awarded to them.

2.   The Charterers did not dispute that, in the normal course of events, hire would be payable as specified by the Owners but they raised three substantive defences to the Owners' claim:

I     The commencement of arbitration proceedings was premature.

II    The commencement of arbitration proceedings is contrary to UK Government guidance.

III   *Force majeure.*

### The relevant contractual provisions.

3.    The charterparty provided, *inter alia,* as follows:

"Box 20: "*Charter hire (state rate and currency) (Cl.12(a), (d) and (e))*

*USD 23,750 PER DAY OR PRO-RATA EXCLUDING FUEL, FRESH WATER, PORT DUES AGENCY AND PILOT FEE, CLERANCE IN/OUT, COMMUNICATION, WEATHER REPORTS, WORK PERMIT< VAT & any additional modifications / requirements by Charterers / End User ...*"

Box 21:"*Extension hire (if agreed, state rate) (Cl.12(b)) to be mutually agreed*

*SAME AS BOX 20*"

Box 24:"*Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 12(e))*

*30 DAYS*"

Box 25:"*Interest rate payable (Cl. 12(e))*

*2%*"

Box 27: "*Meals (state rate agreed) (Cl.6(c))(i))*

*Resident rate: US$ 75 / man / day*

*Casual meal / Guest meal rate: US$15 / meal*"

Box 28: "*Accommodation (state rate agreed) (Cl.6(c))(i))*

*Included in Resident rate (Box 27)*

*Guest rate: US$15 /bunk / man / night*"

Clause 12 "*Hire and Payments*"

"*(a) Hire. - The Charterers shall pay the Hire for the Vessel at the rate stated in Box 20 per day or pro rata for payment thereof from the time that the Vessel is delivered to the Charterers until the expiration or earlier termination of this Charter Party.*

...

*(e) Payments. - Payments of Hire, bunker invoices, and disbursements for the Charterers' account shall be received within the number of days stated in Box 24 from the date of receipt of the invoice. Payment shall be made in the currency stated in Box 20 in full without discount to the account stated in Box 23. However, any advanced for disbursements made on behalf of and approved by the Owners may be deducted from Hire due.*

...

*If payment is not received by the Owners within 5 banking days following the due date the Owners are entitled to charge interest at the rate stated in Box 25 on the amount outstanding from and including the due date until payment is received.*"

Clause 32 "Force Majeure"

"Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Charter Party, provided that they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

...

(b) any Government requisition, control, intervention, requirement or interference;

...

(e) epidemics;

...

(i) any other similar cause beyond the reasonable control of either party.

The party seeking to invoke force majeure shall notify the other party in writing within 2 working days of the occurrence of any such event/condition."

### The Owners' claim

4.   The Owners said that, at the date of service of their claim submissions, the following invoices for the principal sums owed under the charterparty are outstanding and had not been paid by the Charterers:

| Invoice Number | Invoice Date | Due Date | Amount (US$) |
| --- | --- | --- | --- |
| 110000591 | 19/09/2019 | 19/10/2019 | 273,593.25 |
| 110000634 | 10/10/2019 | 09/11/2019 | 3.15 |
| 110000672 | 01/11/2019 | 01/12/2019 | 773,062.50 |
| 110000673 | 01/11/2019 | 01/12/2019 | 6,847.89 |
| 110000690 | 01/12/2019 | 31/12/2019 | 748,125.00 |

| 110000691 | 01/12/2019 | 31/12/2019 | 6,683.99 |
| 110000756 | 31/12/2019 | 30/01/2020 | 255,134.25 |
| 110000757 | 31/12/2019 | 30/01/2020 | 234,029.25 |
| 110000755 | 31/12/2019 | 30/01/2020 | 279,972.00 |
| 110000758 | 31/12/2019 | 30/01/2020 | 773,062.50 |
| 110000759 | 31/12/2019 | 30/01/2020 | 7,960.51 |
| 110000797 | 01/01/2020 | 31/01/2020 | 336,031.70 |
| 110000833 | 01/02/2020 | 02/03/2020 | 3,973.96 |
| 110000867 | 30/03/2020 | 29/04/2020 | 202,718.25 |
| 110000868 | 30/03/2020 | 29/04/2020 | 92,027.25 |
| 110000869 | 31/03/2020 | 30/04/2020 | 4,942.35 |
| **Total:** | | | **3,998,167.80** |

5.   The Owners said that they had repeatedly chased the Charterers to make payment of the outstanding sums due under the charterparty, including in their letter dated 31st March 2020 (sent from Mr David Tan on behalf of the Owners to Mr Donald Sinitiere of the Charterers), which demanded that the Charterers make payment of outstanding sums due under the charterparty within 7 calendar days.

6.   The Owners referred us specifically to two emails.  In an email response dated 6th April 2020 Mr. Donald Sinitiere of the Charterers stated *"Things here in*

*KSA have been very difficult with the lockdowns, working from home and curfew. I have to be in Abu Ali today but will try to contact you on Tuesday to discuss our situation."* The Owners said that the Charterers did not, and have not, disputed that the sums claimed by the Owners are outstanding under the charterparty.

7.   Mr. David Tan, of behalf of Owners, responded by email on 8 April 2020 by stating *"Could you let me know what you wish to discuss? We have not been paid and a significant portion of the debt pre-dates the lockdowns in any case. And banking transactions can be done via internet or remotely out of the office so the lockdowns aren't really the issue."*

**The Charterers' defence**

8.   The Charterers did not deny that the hire had fallen due and would be payable in the normal course of events.  However, they said that the impact of the COVID-19 pandemic has had significant ramifications for their business, resulting in serious and ongoing cash flow difficulties.  They had sought to engage with the Owners in relation to these issues; however, the Owners had *"prematurely rushed to commence arbitration proceedings"*.

9.   The Charterers said that the context in which these arbitration proceedings had been commenced not only provided a substantive defence to the Owners' claims for reasons of *force majeure*, but also raises questions over the Owners' conduct which (the Charterers said) should be reflected in both the Tribunal's determination of the merits and the allocation of costs.  We deal in turn with each limb of the Charterers' defence:

**I     The commencement of arbitration proceedings is premature**

10.   The Charterers said that they had cooperated in good faith during the course of the charterparty.  Prior to 14th January 2020, they had paid all of the invoices issued by the Owners, totalling US$9,720,227.39, within the relevant time period.  However, subsequently they began to experience

significant cash flow difficulties, such that they were unable to continue paying the Owners' invoices.

11. The Charterers said that the Owners had raised no concerns in writing around outstanding invoices until 2nd February 2020.

12. There was a meeting on 11th March 2020, during which Mr Sinitiere of the Owners met the local Charterers' representatives, Joseph Assaf and Ian Chen Zhenwei in Saudi Arabia. Mr Sinitiere described the Charterers' cash flow issues and both parties committed to work together and continue communicating until the payments could be made.

13. A further email was sent by the Charterers to the Owners on 26th March 2020, seeking an update. This email, reflecting (said the Charterers) the by then global concerns caused by COVID-19, began with the words:

   *"Hope you're well amidst all the COVID issues".*

14. On 28th March 2020, Mr Sinitiere of the Charterers responded to the Owners as follows:

   *"I apologize for the late reply. Unfortunately DISA is experiencing a cash flow challenge and are trying to close the gap but it has been difficult getting good information from our client with so many people working from home".*

15. Thus, said the Charterers, they had replied constructively and honestly, conveying the difficulties resulting from the prevailing circumstances.

16. Mr Sinitiere made further reference to the impact of COVID-19 on 6 April 2020, stating:

   *"Things here in KSA have been very difficult with the lockdowns, working from home and curfew. I have to be in Abu Ali today but will try to contact you on Tuesday to discuss our situation".*

17. Mr Sinitiere sent a further email on 17 April 2020 stating:

   *"Unfortunately, we are still working through our issues. As soon as I have a firm date when DISA can make a payment I will advise you".*

18.   It is therefore clear, submitted the Charterers, that they were engaging with the Owners regarding the unpaid invoices and doing what they could to reassure them.  Yet as early as 4th May 2020, the Owners had commenced arbitration proceedings by issuing a Notice of Arbitration and appointing an arbitrator.

19.   The Charterers submitted that "*this rush to commence proceedings*" was premature and contrary to the spirit of cooperation and engagement that had prevailed prior to that point.

## II   The commencement of arbitration proceedings is contrary to UK Government guidance

20.   The Charterers said that, on 7th May 2020, the UK Government had issued guidance on responsible contractual behaviour in the performance and enforcement of contracts impacted by the COVID-19 emergency ("the UK COVID-19 Guidance" or "the Guidance").  They said that this is relevant to the performance of the charterparty in circumstances where it is governed by English law and the seat of the arbitration is London.  The Guidance applies where the performance of contracts has been materially impacted by the COVID-19 pandemic, which the charterparty had been.

The Charterers referred us to the following extracts from the Guidance. Paragraph 1 states that:

> "*The guidance in this note is that parties to contracts should act responsibly and fairly, support the response to Covid-19 and protect jobs and the economy*".

21.   Paragraph 12 states that:

> "*It is recognised that parties to some contracts may find it difficult or impossible to perform those contracts in accordance with their agreed terms as a result of the impact of Covid-19 – including through illness in the workforce, the effects of restrictions on movement of people and goods, revised ways of working necessary to protect health and safety, the closure of businesses or the reduction in a party's financial resources available to make payments otherwise due under the contractual arrangements*" (emphasis added).

22.   Paragraph 14 states:

> "*Responsible and fair behaviour is strongly encouraged in performing and enforcing contracts where there has been a material impact from Covid-19. This includes being reasonable and proportionate in responding to performance issues and enforcing contracts (including dealing with any disputes), acting in a spirit of cooperation and aiming to achieve practical, just and equitable contractual outcomes having regard to the impact on the other party (or parties), the availability of financial resources, the protection of public health and the national interest*" (emphasis added).

23.   Paragraph 15 states (in relevant part):

> "*In particular, responsible and fair behaviour is strongly encouraged in relation to the following:*
>
> *(a) requesting, and giving, relief for impaired performance, including in respect of the time for delivery and completion, the nature and scope of goods, works and services, the making of payments and the operation of payment and performance mechanisms;*
>
> *(b) requesting, and allowing, extensions of time, substitute or alternative performance and compensation, including compensation for increased cost or additional performance;*
>
> *(c) making, and responding to, force majeure, frustration, change in law, relief event, delay event, compensation event and excusing cause claims;*
>
> *(d) requesting, and making, payment under the contract;*
>
> *...*
>
> *(h) claiming breach of contract and enforcing events of default and termination provisions (including termination rights arising by reason of the insolvency or potential insolvency of a party);*
>
> *...*
>
> *(m) commencing, and continuing, formal dispute resolution procedures, including proceedings in court*" (emphasis added).

24.   Paragraphs 16 and 17 state:

> "*16. The responsible and fair behaviour described in paragraphs 14 and 15 should continue to apply in circumstances where the relevant contract is materially impacted by Covid-19, so that fair and equitable outcomes can be achieved in contractual arrangements and the objectives described in paragraph 13 can be met.*
>
> *17. It is recognised in particular that disputes, especially a "plethora of disputes", can be destructive to good contractual outcomes and the effective operation of markets. Further to paragraphs 15(m) and 15(n), the Government would strongly encourage parties to seek to resolve any emerging contractual issues responsibly – through negotiation, mediation or other alternative or fast-track dispute resolution – before these escalate into formal intractable disputes*" (emphasis added)].

25. The Charterers submitted that these proceedings are precisely the sort of disputes that the UK Government was seeking responsible contractual parties to avoid. There could (they said) be no doubt that the Charterers would have paid the invoices had they been able to, as their past contractual performance makes clear. Further, there could similarly be no doubt that the Charterers intended to pay the invoices in future when they are able to do so, after the current difficulties have been resolved. The responsible and fair approach in the meantime would have been for the Owners to have engaged further with the Charterers in order to agree a revised timetable for payment, rather than rush to arbitration.

26. At the very least, submitted the Charterers, the premature commencement of arbitration proceedings contrary to the Guidance should be reflected in the allocation of costs by the Tribunal.

### III  *Force Majeure*

27. The Charterers repeated that their business had been significantly affected by the COVID-19 pandemic, and this had prevented and/or hindered the performance of their obligations under the charterparty. As a result, the Charterers relied on the *force majeure* provisions in Clause 32 of the charterparty. They noted that the Guidance expressly includes at paragraph 15(c) responding to *force majeure* claims as a circumstance in which parties are strongly encouraged to behave fairly and responsibly.

28. **First**, the COVID-19 pandemic had significantly delayed the resolution of numerous change orders and related claims in relation to the two projects between the Charterers and Saudi Arabian Oil Company ("Aramco"); including the project for which the Charterers had engaged the Owners. This was directly connected to the charterparty because Aramco are the Charterers' contract counterparty under onward supply arrangements for the purposes of which the Charterers entered into the charterparty with the Owners.

29. The Charterers said that they are entirely dependent on Aramco to generate revenue. They currently only have two projects, both for Aramco. They have no other customers or sources of revenue. There are numerous change orders pending that span both projects, the resolution of which, the Charterers said, has delayed and/or hindered their ability to pay the Owners.

30. The Charterers said that once Saudi Arabia implemented the first limited curfew and restrictions on travel, shutdown of governmental agencies and private industry staff limitations, normal activities within Aramco and the ability of contractors to engage directly with Aramco slowed down and in some cases stopped except for essential Aramco operations. Getting Aramco employees to respond to even the most routine inquiries became problematic. Efforts by the Charterers to engage with Aramco seeking Aramco decisions on and resolutions of the referenced disputes and other outstanding issues slowed considerably and in some cases came to a complete standstill. Many remain at a complete standstill at present.

31. As such, said the Charterers, these change order disputes, which could reasonably have been expected to have been resolved by now, remain unresolved. Due to (a) the dependence of the Charterers as a relatively small company on the revenues generated by these projects with Aramco; and (b) the ongoing delay in resolving the change orders with Aramco and/or receiving resulting change order payment from Aramco, very significant cash flow difficulties have arisen within the Charterers. This means that the Charterers cannot presently pay the Owners' invoices, as well as those of other vendors. This continues and is not expected to end for several months.

32. **Second**, said the Charterers, their ongoing project work has been impacted by their not being able to achieve planned and anticipated progress due to the severe disruption caused by the COVID-19 pandemic. As a result, progress billing and projected monthly invoicing has been substantially impacted and revenue to the company has been significantly reduced. As

such, this has directly affected the Charterers' ability to generate revenue and impacted their cash flow.

33.  **Third**, the COVID-19 pandemic has significantly impacted the day-to-day operations of the Charterers' business.  The Charterers have a small team, many of whom have been repatriated to their home countries, in a number of cases causing them to be quarantined and unable to re-enter Saudi Arabia. For those remaining in Saudi Arabia, they have been greatly affected by the lockdown measures taken by the Government, including nationwide curfews and widespread restrictions on movement and business activities.  This has affected both the Charterers' ability to perform contractual obligations but also to resolve existing disputes.  Again, this is ongoing.

34.  For convenience, we repeat the relevant part of Clause 32:

> "*Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Charter Party, provided that they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:*
>
> *...*
>
> *(b) any Government requisition, control, intervention, requirement or interference;*
>
> *...*
>
> *(e) epidemics;*
>
> *...*
>
> *(i) any other similar cause beyond the reasonable control of either party.*
>
> *The party seeking to invoke force majeure shall notify the other party in writing within 2 working days of the occurrence of any such event/condition.*"

35.  The Charterers submitted that there can be no doubt that Clause 32 is broad enough to cover the COVID-19 pandemic.  The express reference to "*epidemics*" in Clause 32(e), coupled with the sweep-up wording in Clause 32(i) makes this clear, a pandemic being a "*similar cause*" to an epidemic and also beyond either party's control.

36. Further or alternatively, submitted the Charterers, the Government's action in Saudi Arabia in response to the COVID-19 pandemic, constitutes "*Government requisition, control, intervention, requirement or interference*", as provided in Clause 32(b), or, alternatively, a "*similar cause beyond the reasonable control*" of the Charterers under the sweep-up language of Clause 32(i).

37. As a result of these events of *force majeure*, the Charterers said that they have plainly been at least "*hindered*", and arguably "*prevented*", from performing their obligations under the charterparty. Whilst they have made all reasonable efforts to avoid, minimise or prevent the effects of these events, they quite simply have insufficient cash reserves to pay the sums due and there is nothing that they can reasonably do to resolve this until revenue starts flowing again.

38. The Charterers said that they had made this clear to the Owners in correspondence. By way of summary:

   (a) The parties held discussions in Saudi Arabia on 11th March 2020, in which Mr Sinitiere described the Charterers' cash flow issues.

   (b) The Owners themselves recognised the problems, noting "*all the COVID issues*" in their email to the Charterers of 26th March 2020.

   (c) Mr Sinitiere confirmed on 28th March 2020 that "[the Charterers are] *experiencing a cash flow challenge and are trying to close the gap but it has been difficult getting good information from our client with so many people working from home*".

   (d) On 6th April 2020, he reiterated that "*Things here in KSA have been very difficult with the lockdowns, working from home and curfew*".

   (e) Finally, on 17th April 2020, he noted that "*Unfortunately we are still working through our issues*".

39.   Given the timing of these emails, said the Charterers, it cannot be disputed that they arose during the COVID-19 emergency, when they, as with so many other businesses, were impacted by the growing pandemic.

40.   In the circumstances, whilst no formal *force majeure* notice for the purposes of Clause 32 of the charterparty had been issued by the Charterers, by these communications and exchanges they have given notice of the events relied upon under Clause 32.

41.   Further or alternatively, the drafting of the notice provisions in Clause 32 makes clear that the parties did not intend the giving of notice to be a condition precedent to reliance on the substantive *force majeure* provisions.

42.   As such, they submitted that they are relieved of liability for their obligations under the charterparty whilst these events of *force majeure* are ongoing, including the obligation to pay the invoices claimed by the Owners.

43.   The Charterers requested the Tribunal to render an award:

   (a)   declaring that the Charterers are entitled to rely on the *force majeure* provisions in Clause 32 of the as a defence to the Owners' claims; charterparty;

   (b)   dismissing the Owners' claims in full; and

   (c)   ordering the Owners to pay all of the Charterers' costs incurred in connection with this arbitration, including fees and expenses of the Tribunal, legal fees and expenses, witnesses' expenses, and interest on all costs awarded.

**The Owners' Reply Submissions**

44.   The Owners submitted that none of the Charterers' defences have any merit. In the Owners' submission, it is plain that the above defences have been raised with the objective of stifling and frustrating the Owners' straightforward claim for payment of hire and disbursements.

45. In this regard, said the Owners, it is telling that Charterers have not challenged either the validity or quantum of Owners' invoices, thereby accepting that the invoices represent legitimate claims by Owners for hire and disbursements. As a result, the only issues requiring determination are the three defences raised by the Charterers.

**I    The Charterers' submission that the commencement of arbitration proceedings is premature**

46. The Owners said that the Charterers' submissions have no merit as a matter of law.

47. The starting point is to consider the wording of the arbitration clause between the parties, the BIMCO Dispute Resolution Clause at clause 34 of the Charterparty (as quoted in our Award).

48. There are no preconditions to the valid commencement of arbitration proceedings set out in clause 34; it simply provides that "*a party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice*". The Owners served a notice of arbitration on 4th May 2020 after a dispute had arisen between the Owners and the Charterers regarding payment of the Owners' invoices, with the Charterers in breach of the clause 12(e) obligation to make payment of invoices within 30 days of receipt of the relevant invoice. There was plainly a "*dispute*" between the parties regarding the outstanding invoices at the time arbitration proceedings were commenced (and the fact that the Charterers had asserted in their Defence Submissions that they were not liable to pay the outstanding invoices was further confirmation of this). The Owners said that they were therefore entitled to commence arbitration proceedings as a means of seeking a resolution to the dispute, through seeking relief from an Arbitration Tribunal.

49. In any event, said the Owners, there were numerous exchanges between the parties in which the Owners sought a resolution to the dispute prior to the commencement of arbitration proceedings. As such, in any event, the Owners had sought to resolve the dispute between the parties on a commercial level without recourse to arbitration proceedings.

50. However, in response to the Owners' chasers for payment of the Owners' outstanding invoices, the Charterers simply sent vague and non-committal responses, and failed to confirm when payment would be made. This was notwithstanding the fact that the Charterers were in breach of the terms of the charterparty, and considerable sums were owed by Charterers to the Owners. The Owners rejected the Charterers' assertion that they "*replied constructively and honestly*" to the Owners' requests for payment; the Charterers' responses did not explain when payment would be made and simply represented an attempt to stall on making payment.

51. Further or alternatively, the Owners submitted that they were entitled to commence and progress arbitration proceedings against the Charterers in order to obtain Arbitration Award(s) against the Charterers, in order that they could use the Award(s) to claim under the Parent Company Guarantee issued by the Charterers' parent company, Dynamic Industries Inc. If the Charterers face cash flow difficulties, then the Owners are entitled to obtain Arbitration Award(s) so they can seek to obtain payment from the Charterers' parent company in respect of sums owed by the Charterers.

52. As such, the Owners were not only entitled pursuant to clause 34 to commence arbitration proceedings against the Charterers to pursue their claim, but were also justified in doing so.

**II    The Charterers' submission that the commencement of arbitration proceedings is contrary to the UK Guidance on responsible contractual behaviour in the performance and enforcement of contracts impacted by COVID-19**

53. The Owners' position was that the UK Covid-19 Guidance:

   (a)   is not applicable to the contractual relationship between the Owners
         and the Charterers (neither party being a UK party);

   (b)   is guidance only, and does not affect the Owners' rights and remedies
         available under the charterparty or at law;

   (c)   in any event, even if the UK Covid-19 Guidance is applicable, it has not
         been breached by Owners.

54. The starting point, submitted the Owners, is that, as set out in the section
    with the sub-heading "*purpose of this note*", the UK Covid-19 Guidance refers
    to the "*national response*" to the public health emergency of Covid-19, and
    refers to "*our economy*". As such, the UK Covid-19 guidance is directed to UK
    companies and the UK economy, not an international contract between the
    Owners and the Charterers, neither of which are UK entities; both being
    Saudi Arabian companies. The only relevant link to the UK of the
    charterparty is that the parties have chosen that their contractual terms are
    governed by English law and disputes are to be resolved by LMAA
    Arbitration in London. The UK Covid-19 Guidance is therefore not applicable
    to the Owners and/or the Charterers.

55. In any event, argued the Owners, even if the UK Covid-19 Guidance is
    applicable, paragraph 6 of the UK Covid-19 Guidance expressly states "*it is
    non-statutory guidance*", and paragraph 7 of the UK Covid-19 Guidance
    states:

   > "*Whilst this guidance has general application to all active contractual arrangements
   > materially impacted by Covid-19, it is guidance only and is not intended to override:*
   >
   > *(b)    any specific support or relief available:*
   >
   > > *(i)    in the relevant contract (for example relief given in express provisions in
   > > the contract),*
   > >
   > > *(ii)   in law, custom or practice (including any equitable relief),*

> *This guidance does not apply to contracts or transactions which are speculative in nature in respect of risks similar to the Covid-19 emergency or to financial market transactions."*

56.  As such, submitted the Owners, the UK Covid-19 Guidance is not stated to affect their rights under the charterparty to a) commence arbitration proceedings and b) obtain Award(s) for outstanding sums owed by the Charterers.

57.  In any event, even if the UK Covid-19 Guidance is applicable, the Owners denied that they were in breach of the Guidance. Despite sending numerous chasing messages for payment, the Charterers had not confirmed (or even indicated) the timeframe in which they intended to make payment, or set out a proposed payment schedule for the outstanding debt. In refusing to make payment of the outstanding invoices (despite the fact that they are contractually obliged to do so), and by failing to give any indication of the timeframe when payment will be made, the Charterers are effectively seeking an indefinite extension in the period for making payment of outstanding invoices, during which the Owners cannot take any steps to obtain payment.

58.  Moreover, the UK Covid-19 Guidance applies to both parties; for example, paragraph 15(d) refers to *"requesting, and making, payment under the contract"*. The Charterers, in failing to make payment of the Owners' invoices due under the charterparty, are causing cash flow difficulties to the Owners, who are owed the principal sum of US\$3,998,167.80.  The Owners have their own payment obligations to other parties, and the Charterers' ongoing failure to make payment affects the Owners' ability to satisfy those payment obligations.

59.  Even if the Charterers face financial difficulties and cash flow difficulties in making payment of the outstanding invoices, then the Owners should be entitled to obtain Award(s) in order so that they can make a claim against the Charterers' parent company under the Parent Company Guarantee.

### III   The Charterers' submission that they are entitled to rely on *force majeure* under clause 32 of the charterparty

60.   It was the Owners' case that Clause 32 of the charterparty is not applicable, and, in any event, cannot excuse the Charterers from their obligation to pay Owners' outstanding invoices.

61.   The wording of clause 32 provides:

> *"Neither party shall be **liable for any loss, damage or delay due to** any of the following force majeure events and/or **conditions to the extent the party invoking force majeure is prevented or hindered from performing** any or all of their obligations under this Charter Party, **provided that they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:** ..."* (the Owners' emphasis added)

62.   The starting point is therefore that, in order for a party to rely on clause 32, they need to be able to demonstrate that there has been a *force majeure* event falling within clause 32, and that event needs to have "*prevented*" or "*hindered*" that party from performing their obligations under the Charterparty.

63.   The wording "*due to*" in the first sentence indicates that the failure to perform must be "*due to*" the *force majeure* event in question. In other words, there is a need to establish a causal link between the force majeure event and the inability to perform, following the Court of Appeal decision in Classic Maritime Inc -v- (1) Limbungan Makmur SDN BHD & (2) Lion Diversified Holdings BHD [2019] EWCA Civ 1102. This is also confirmed by the wording "*to the extent the party invoking force majeure is prevented or hindered from performing*"; the words "*to the extent*" indicate that any relief is only available "*to the extent*" a *force majeure* event caused "*loss, delay and damage*".

64.   However, there is no causal link between the alleged *force majeure* events complained of by the Charterers, and the Charterers' failure to pay the Owners' invoices. The vessel was redelivered on 17th January 2020, before there had been any global impact of COVID-19, and before the initial lockdowns on Wuhan and other cities in the Hubei Province in China were

imposed on 23rd January 2020. As such, the charterparty had been performed and concluded before the impact of COVID-19, and the only outstanding obligation was for the Charterers to make payment of the Owners' outstanding invoices. This is not an obligation that is affected by clause 32.

65. Invoices 110000591, 110000634, 110000672, 110000673, 110000690 and 110000691 all fell due on or before 31st December 2019, so there is no basis whatsoever on which the Charterers can contend that their failure to pay is "*due to*" or "*prevented or hindered*" by the impact of COVID-19.

66. Invoices 110000756, 110000757, 110000755, 110000758, 110000759 were issued on 31st December 2019 and fell due on 30th January 2020, whilst invoice 110000797 was issued on 1st January 2020 and fell due on 31st January 2020. Again, there is no basis on which the Charterers can contend that payment of these invoices was "*due to*" or "*prevented or hindered*" by the impact of COVID-19. The first case of COVID-19 was confirmed in Saudi Arabia on 2nd March 2020, long after payment of these invoices had fallen due.

67. Whilst invoices 110000833, 110000867, 110000868 and 110000869 fell due on 2nd March 2020, 29th April 2020, 29th April 2020 and 30th April 2020 respectively, they relate to the performance of the charterparty provided by the Owners prior to the impact of COVID-19. In any event, these four invoices total US$303,661.81, a small percentage of the Owners' principal claim of US$3,998,167.80.

68. The Charterers therefore cannot establish that they would have been able to pay the invoices "*but for*" the impact of the COVID-19. Indeed, it is apparent from the content of the Charterers' Defence Submissions that the real reason they have failed to make payment to the Owners is that they have "*insufficient cash reserves*" because of issues regarding the projects between the Charterers and the Saudi Arabian Oil Company. However:

(a)   "*Insufficient cash reserves*" is not a *force majeure* event;

(b)  Any delay in the "*resolution of numerous change orders and related claims*" or failure to receive payment from Aramco cannot excuse the Charterers' failure to pay the Owners' invoices due under the charterparty. They are entirely separate contracts, and the parties did not agree that the Charterers' liability to pay the Owners' invoices would be contingent on the Charterers receiving payment from third parties.

69.  Further, under clause 32 the Charterers are under an obligation to give the Owners notice in writing within 2 working days of the occurrence of any applicable *force majeure* event or condition. The Charterers had conceded that they did not give any such notice, failing to meet the condition precedent for reliance on clause 32. The Defence Submissions constitute the Charterers first reference to an alleged *force majeure* event. The Charterers' attempt to rely on clause 32 is plainly an afterthought and a last minute attempt to avoid liability for contractual obligations to make payment in relation to a charterparty that had been performed by the Owners and concluded.

70.  In any event, the wording of clause 32 is narrower than the Charterers contend; it states that "*neither party shall be liable for any loss, damage or delay*" due to any of the specified *force majeure* events. The wording of the clause could not (as the Charterers' contend) lead to an outright dismissal of the Owners' claims for unpaid invoices; at most, it could only excuse liability for "*delay*" in payment. However, the provisions of clause 32 are not applicable in any event, with the Charterers' failure to make payment to Owners pre-dating the impact of COVID-19.

71.  Further or alternatively, even if the Charterers have "*insufficient cash reserves*" and are unable to make payment, this should not preclude the Owners from obtaining Award(s) from the Tribunal in respect of the outstanding sums owed to the Owners, in order that the Owners can seek to obtain payment from the Charterers' parent company under the Parent

Company Guarantee or seek to enforce payment against the Charterers' assets.

## The Owners' application for a Final Award

72. By email dated 16th July 2020, Clyde & Co. on behalf of the Owners applied for the Tribunal's immediate determination of the Owners' claim on the basis of the submissions served to date and for (1) a Final Award in respect of the principal sum of US$3,998,167.80 and costs and (2) a Final Award in respect of interest at the contractual rate of 2% per month.

73. The Owners submitted that their claim, and each of the submissions raised in the Charterers' Defence Submissions, can be determined by the Tribunal now on the basis of the submissions served to date. They said that they have a straightforward claim for unpaid hire and disbursements and no challenge had been made by the Charterers to the validity or quantum of their invoices. As a result, the only issues that require determination by the Tribunal are whether the Charterers have any valid defence to the Owners' claim.

74. They stressed the importance that owners of vessels are paid hire and disbursements promptly, as receiving income owed is key to the functioning of international trade, it being required for, amongst other aspects, payment of operational expenses. In their submission, the defences raised by the Charterers were nothing more than an attempt to stifle and frustrate the determination of a legitimate claim by the Owners for hire and disbursements. By way of analogy to the case of *The "Kostas Melas"* [1981] 1 Lloyd's Rep. 18, the Owners submitted that they were entitled to a prompt determination of their claim for hire and disbursements, akin to applications for interim awards for hire on *Kostas Melas* principles.

75. The Owners submitted that the three defences advanced by the Charterers plainly had no merit and had been raised with the objective of stifling and frustrating the Owners' claim, so that the Owners cannot obtain Award(s) promptly against the Charterers. The Owners submitted that the Tribunal

is capable of determining their claims now and they therefore applied, pursuant to paragraph 22 of the Second Schedule to the LMAA Terms 2017 ("the LMAA Terms"), for the Tribunal's immediate determination of the Owners' claim on documents only as set out above.

76.    The Owners said that the application was being made simultaneously with service of the Reply Submissions, as it concerned procedural aspects immediately following service of Reply Submissions.  They said that they had made this application to the Tribunal now, in order that the Tribunal was aware of the application before any other procedural directions were ordered. As a result, the content of the application had not been discussed in advance with the Charterers.

### The Charterers' response to the application

77.    The Charterers said that the Owners' application should be dismissed.

78.    First, the Claimant's application was made in contravention of the procedural requirements set out in the LMAA Terms. Paragraph 14 of the Second Schedule to the LMAA Terms states that *"[a]ny application to a tribunal for directions as to procedural or evidential matters should, save in exceptional circumstances, be made only after the other parties have been afforded an opportunity to agree, within 3 working days, the terms of the directions proposed."* There were, they said, no such exceptional circumstances here. The Claimant appears simply to have taken it upon itself to make the application without affording any opportunity to the Respondent to agree. Paragraph 14 goes on to say that *"[a]ny application that has not previously been discussed with the representatives of such other parties and that does not fully record the rival positions of the parties will normally simply be rejected by a tribunal"*.

79.    Second, whilst the application purports to be made under Paragraph 22 of the Second Schedule, they argued that there is no suggestion in Paragraph 22 or elsewhere that the Terms contemplate a procedure in which, absent

agreement between the Parties, the Tribunal proceeds to an immediate determination following the conclusion of the written submissions phase. Indeed, the LMAA Terms expressly state in Paragraph 11(a) of the Second Schedule that: "*Unless the parties agree that the reference is ready to proceed to an award on the exclusive basis of the written submissions that have already been served, both parties must complete the Questionnaire set out in the Third Schedule within 14 days of the service of the final submissions as set out in paragraph 5 above*". There had been no such agreement between the parties to depart from the procedure set out in the Second Schedule (and the Owners did not seek such agreement before making its application). As such, the parties should now proceed with completion of the Questionnaires, as set out in Paragraph 11(a).

80. Third, had the Owners approached the Charterers regarding their procedural proposal, the Charterers would have rejected it as inappropriate, given the issues in dispute between the parties. The Charterers relied, *inter alia*, on *force majeure* as a defence to the Owners' claim. The Owners had engaged with that argument and raised various factual arguments by way of response. The Charterers said that they are entitled to support their legal case by reference to evidence, including statements of evidence of fact. This is precisely why the Questionnaires required by Paragraph 11(a) of the Second Schedule are to be submitted by the parties, so that their proposals regarding evidence and other matters can be put forward. Paragraph 12 notes that "*subject to contrary agreement of the parties or an appropriate ruling by the tribunal, the parties will be required to exchange statements of evidence of fact (whether to be adduced in evidence under the Civil Evidence Acts or to stand as evidence in chief) as well as expert evidence covering areas agreed by the parties or ordered by the tribunal within a time scale agreed by the parties or ordered by the tribunal*".

81. Further, said the Charterers, they are entitled to propose that there be an oral hearing and that they be entitled to make oral submissions before the Tribunal. The effect of the Owners' application is to seek to preclude any

argument by the Charterers that an oral hearing is appropriate or required. Whilst the LMAA Terms make provision for arbitrations on documents alone, Paragraph 14(b) of the LMAA Terms envisages that this should be the subject of agreement between the parties, not that it should be imposed by the application of one party in disregard of the other.

82. Fourth, the Charterers rejected any suggestion that the *force majeure* argument had been made in *"an attempt to stifle and frustrate"* the Owners' claim. The Charterers' *force majeure* argument is made in the specific circumstances of the current pandemic, which, like many others around the world, have resulted in extraordinary challenges for the Charterers' business. The Charterers noted that the Owners do not dispute that the COVID-19 pandemic constitutes an event of *force majeure* under Clause 32 of the charterparty. The Charterers said that they are entitled to make out the remaining elements of their claim by reference to the evidence and submissions required. The situation is not comparable to that in *The "Kostas Melas"*. It is, in fact, the Owners who seek to stifle the Charterers' arguments.

83. The Charterers requested that the Tribunal dismiss the Owners' application and allow the parties to continue with the arbitration in accordance with the proper procedure set out in the Second Schedule to the LMAA Terms. To do otherwise, they argued, would prejudice them by depriving them of their fundamental right to put forward their case in full.

## The Owners' reply to the Charterers' response to the Owners' application.

84. The Owners maintained their application.

85. They said that the key point underpinning the application is that they have a straightforward claim for unpaid hire and disbursements, and no challenge has been made by the Charterers to the validity of the Owners' invoices.

86. Whilst the Charterers had raised numerous defences to the claim, in the Owners' submission these defences plainly are without merit, and the

Tribunal can (and should) immediately proceed to issue Awards in respect of the Owners' claim for hire and disbursements.

87.   In reply to the substance of the Charterers' response, the Owners argued:

**(1)   The alleged breach of the LMAA Terms.**

(i)   As set out in the final paragraph of the Owners' application, the application was served simultaneously with the Reply Submissions in order so that the Tribunal was aware of the Owners' application before any other procedural directions were ordered.

(ii)   Whilst in normal circumstances, it is proper and appropriate that the other party is afforded an opportunity to agree the content of any application before the Tribunal are approached, the Owners' concern in this case was that procedural directions (specifically an order for exchange of LMAA Questionnaires) would be ordered following service of the Reply Submissions before the Owners' application had been received by the Tribunal. This would have defeated the application before it had been made.

**(2)   Should the next step be the exchange of Questionnaires?**

(i)   Under both the LMAA Terms and the Arbitration Act 1996, the Tribunal has discretion to order appropriate procedural directions to determine the claim advanced, and in particular pursuant to Paragraph 22 of LMAA Terms to vary those that are "*contemplated above*" (i.e. those set out in the Second Schedule). In normal cases, it is appropriate that following close of pleadings, the parties exchange LMAA Questionnaires, in order so that the Tribunal and the parties can properly consider the next procedural steps. However, in this case, pursuant to Paragraph 22, the Owners are submitting that it is appropriate for a "different course to be followed" because the Tribunal has all the

information and submissions necessary to determine the Owners'
claim for unpaid hire and disbursements.

(ii)   Further, the Owners submitted that the content of the Charterers'
response clearly indicated that they do not want the Owners' claim
to be determined promptly, and "*in line with their tactics to date,
intend to delay determination for this dispute as long as possible*".
The Owners stressed that this is a straightforward claim for
(unchallenged) invoices for hire and disbursements, easily capable
of being determined on the submissions and documents served to
date, and it is not necessary for LMAA Questionnaires to be
exchanged.

**(3)   Is it appropriate to proceed to a final determination now?**

(i)   The Owners submitted that each of the defences advanced by the
Charterers in the Defence Submissions are capable of being
determined on the basis of the submissions and exhibits served to
date, and no further evidence or submissions is required.

(ii)   The first defence advanced by the Charterers is that the
commencement of arbitration proceedings "*was premature and
contrary to the spirit of cooperation and engagement that had
prevailed prior to that point.*" In the Owners' submission, this is a
legal argument that has no merit whatsoever, and being a purely
legal point, the Tribunal does not require any further input from
the parties to determine it.

(iii)   The second defence advanced by the Charterers is that the
commencement of arbitration proceedings was contrary to COVID-
19 guidance issued by the UK Government. Again, in the Owners'
submission, this argument has no merit whatsoever, as inter alia,
as the UK Government guidance is not applicable to the
contractual relationship between the Owners and the Charterers

(neither being UK parties), and is expressly stated to be "*non-statutory guidance*" which does not override contractual terms or relief available at law. In the Owners' submission, this argument is spurious and should be dismissed by the Tribunal without any further input from the parties.

(iv) The third defence advanced by the Charterers is that of *force majeure*. Again, this argument can be dismissed by the Tribunal without any further input or evidence from the parties, for the simple reason that the Vessel was redelivered and the charterparty concluded on 17th January 2020, before there had been any global impact of COVID-19. Moreover, as set out in paragraph 29 of the Reply Submissions, "*insufficient cash reserves*", which arise from contractual issues between Charterers and Saudi Aramco cannot, under the wording of clause 32, constitute a *force majeure* event. Further submissions or witness evidence from the Charterers cannot change the fact that as a matter of law, the Charterers are not entitled to rely on clause 32 to delay determination of liability for sums owed to the Owners.

(v) Even if clause 32 could have been validly triggered by the Charterers (notwithstanding the fact that no notice of force majeure was given contemporaneously), it cannot retrospectively affect the Charterers' obligation to pay debts that have already accrued. Even if the Tribunal considers that the Charterers could, in theory, rely on clause 32 due to COVID-19, it could only entitle the Charterers to delay making payment in respect of invoices which fell due <u>after</u> COVID-19 had impacted the Charterers' operations. As such, the Charterers' assertion of *force majeure* should not in any event prevent the Tribunal issuing Awards in respect of invoices which fell due before COVID-19 had an impact.

(vi)   The Owners submitted that an oral hearing is not required for this matter. The claim is for uncontested invoices for hire and disbursements, and determination of the simple (and obviously flawed) legal defences asserted by the Charterers does not require an oral hearing. This is analogous to the determination of claims for unpaid hire, under *Kostas Melas* principles.

(4)   **The Charterers' submission that the *force majeure* argument was not designed to stifle the claim**

(i)   The Owners submitted that it is apparent from the Charterers' actions and the content of the Charterers' submissions to date that the Charterers' aim is to seek to delay the determination of the Owners' claim for as long as possible. This should not, said the Owners, be permitted by the Tribunal, as unnecessary delay would cause significant prejudice to the Owners, in circumstances where the Owners have their own payment obligations in respect of the vessel.

(ii)   The Owners said that whilst the Charterers' had asserted that they have a "*fundamental right to put forward its case in full*", this is tempered against s.1 of the Arbitration Act 1996, which provides that "*the object of arbitration is to obtain the fair resolution of disputes by an impartial tribunal without unnecessary delay or expense*". The Owners submitted that the Charterers have already had an opportunity to put forward their case in full through their Defence Submissions, and from this it is evident that none of the Charterers' defences have legal merit. As such, said the Owners, the Charterers should not be permitted to cause "*unnecessary delay*" to the arbitration and the Tribunal should immediately proceed to determine the Owners' claim for hire and disbursements on the basis of the documents and evidence before it.

### Discussion and our findings

88. The starting point is to determine whether it is appropriate to entertain the application for an immediate determination now of the Owners' claim on the basis of the submissions served to date.   The Owners' application was expressed to be pursuant to paragraph 22 of the Second Schedule of the LMAA Terms which provides:

> *"22   Parties are at liberty to apply to a tribunal for directions which differ from those contemplated above, but any such application should clearly explain why it is appropriate for some different course to be followed."*

In their response to the application, the Charterers raised four objections and we deal with each in turn.

89. First, they said that the application was made in contravention of the procedural requirements set out in the LMAA Terms in that it had not previously been discussed with them.

90. The Owners' response was that their concern in this case was that procedural directions (specifically an order for exchange of LMAA Questionnaires) would be ordered before their application had been received by the Tribunal, thus defeating the application before it had been made.   For that reason, the application was served simultaneously with the Reply Submissions.

91. This seemed to us to be eminently reasonable in that, had an order for directions (i.e., for service of Questionnaires) been made in the interim, that would have defeated the application before it had been heard.

92. Accordingly, we rejected this submission.

93. The Charterers' second objection was that, in the absence of an agreement between the parties to depart from the procedure set out in the Second Schedule, there was an obligation on both parties to complete the Questionnaires.

94. We agree with the Owners that, in this case, it is appropriate for a *"different course to be followed"* because we have all the information and submissions necessary to determine the Owners' claim for unpaid hire and disbursements.

95. The Charterers third argument, namely that the application is inappropriate, given the issues in dispute between the parties, and that it is appropriate that there be an oral hearing, we agree with the Owners that each of the defences advanced by the Charterers in the Defence Submissions (including the *"force majeure"* defence) are capable of being determined on the basis of the submissions and the exhibits served to date and that no further evidence or submissions are required. We do not consider that an oral hearing is required for the fair determination of this matter. The Owners' claim is based on uncontested invoices for hire and disbursements and determination of the legal defences asserted by the Charterers does not require an oral hearing. We agree with the Owners that the application is analogous to the determination of claims for unpaid hire under *Kostas Melas* principles.

96. The fourth argument advanced by the Charterers, namely that they are entitled to make out the remaining elements of their claim *"by reference to the evidence and submissions required"* is ill-founded. We agree with the Owners that this is a straightforward claim and one easily capable of determination on the basis of the submissions and documents before us. We bear in mind, of course, section 1 of the Arbitration Act 1996 which provides that:

> *"The object of arbitration is to obtain a fair resolution of disputes by an impartial tribunal <u>without unnecessary delay or expense.</u>"* (our emphasis added)

97. The Charterers have already had an opportunity to put forward their case in full through their Defence Submissions and we are in a position now to determine the merits of the Charterers' defences.

98. Accordingly, we have no hesitation in concluding that we should consider the application on its merits and on the basis of the submissions and documents presently before us.

99. We now turn to consider the three limbs of the Charterers' defence.

### I    "The commencement of arbitration proceedings was premature."

100. We agree with the Owners that there are no preconditions to the valid commencement of arbitration proceedings set out in clause 34; it simply provides that *"a party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice"*.

101. The Owners served a notice of arbitration on 4th May 2020 after a dispute had arisen between the parties regarding payment of the Owners' invoices.

102. There were numerous exchanges between the Owners and the Charterers in which the Owners sought a resolution of the dispute prior to the commencement of arbitration proceedings.  In no way could it be said that the commencement of arbitration proceedings was premature.

103. We reject the Charterers' assertion that they *"replied constructively and honestly"* to the Owners' requests for payment.  Their various responses did not explain when payment would be made and simply represented an attempt to delay (or, as the Owners said justifiably, *"stall"*), making payment.

104. We note the Owners' position that they are entitled to commence and progress arbitration proceedings in order to obtain arbitration awards against the Charterers, in order that they can use the awards to claim under the Parent Company Guarantee issued by the Charterers' Parent Company, Dynamic Industries Inc.  Given the cash flow difficulties asserted by the Charterers, the Owners are plainly entitled to obtain arbitration awards so

that they can then seek to obtain payment in respect of sums owed by the Charterers from the Charterers' Parent Company.

105. We agree with the Owners that not, only were they entitled pursuant to clause 34 to commence arbitration proceedings against the Charterers to pursue their claim, but were also justified in so doing.

II   *"The commencement of arbitration proceedings is contrary to UK Guidance on responsible contractual behaviour in the performance and enforcement of contracts impacted by COVID-19"*

106. We agree with the Owners (for the reasons given by them) that the UK COVID-19 Guidance:

(a)   is not applicable to the contractual relationship between the Owners and the Charterers (neither party being a UK party);

(b)   is guidance only, and does not affect the Owners' rights and remedies available under the charterparty or at law;

(c)   in any event, even if the UK Covid-19 Guidance is applicable, it has not been breached by Owners.

107. The Guidance is directed at UK companies and the UK economy, not to an international contract between the Owners and the Charterers, neither of which are UK entities (both being Saudi Arabian companies).  Moreover, the Guidance expressly states that *"it is not non-statutory guidance"* and it is not intended to override *"any specific ... relief available ... in the relevant contract ... [and]... in law, custom or practice"*.  Even had the Guidance been applicable, we do not consider that the Owners were in breach of it.  In refusing to make payment of the outstanding invoices (despite their contractual obligation to do so) and by failing to give any indication of the timeframe when payment would be made, the Charterers were effectively seeking an indefinite extension in the period for making payment of

outstanding invoices, during which the Owners could not take any steps to obtain payment.  That cannot have been the intention behind the Guidelines.

### III  *Force Majeure*

108. We agree with the Owners that there is a need to establish a causal link between the *force majeure* event and the inability to perform.  In this case there is no causal link between the alleged *force majeure* events complained of by the Charterers and the Charterers' failure to pay the Owners' invoices. The vessel was redelivered on 17th January 2020, before there had been any global impact of COVID-19 and before the initial lockdowns on Wuhan and other cities in Hubei Province in China were imposed on 23rd January 2020. The charterparty had been performed and concluded before the impact of COVID-19 and the only outstanding obligation is for the Charterers to make payment of the Owners' outstanding invoices, which is not an obligation affected by clause 32.

109. Most of the invoices fell due prior to 31st January 2020.  There is no basis on which the Charterers could contend that payment of those invoices was "*due to*" or "*prevented or hindered*" by the impact of COVID-19.  The four invoices which fell due on 2nd March, 29th April, 29th April and 30th April 2020 respectively relate to the performance of the charterparty provided by the Owners prior to the impact of COVID-19.

110. It is apparent from the Charterers' Defence Submissions that the real reason that they failed to make payment to the Owners (the dominant and effective cause) is that they have "*insufficient cash reserves*" because of issues regarding the projects between them and Aramco.  "*Insufficient cash reserves*" is not a *force majeure* event and any delay in the "*resolution of numerous change orders and related claims*" or failure to receive payment from Aramco cannot excuse the Charterers' failure to pay the Owners' invoices due under the charterparty.  We agree with the Owners that they are entirely separate contracts and the parties did not agree that the Charterers' liability to pay

the Owners' invoices would be contingent on the Charterers receiving payment from third parties.

## Conclusion

111. We have no hesitation in concluding that the Owners are entitled to the relief that they have sought, namely:

(1) an award for US$3,998,167.80 in respect of the outstanding principal debt owed to the Owners under the charterparty;

(2) costs (in line with the usual rule that costs follow the event as per section 61(2) of the Arbitration Act 1996);

(3) interest at the contractual rate of 2% per month, to run from the due date of each of the invoices set out in the table in paragraph 4 above until payment.

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

BETWEEN:-

### POSH SAUDI CO. LTD.
of Dammam, Saudi Arabia

Claimants
(Owners)

and

### DYNAMIC INDUSTRIES SAUDI ARABIA LTD.
of Al Khobar, Saudi Arabia

Respondents
(Charterers)

### "POSH ENDEAVOUR"

Charterparty dated 1st October 2018

---

### FINAL ARBITRATION AWARD
### AND REASONS

---